# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# ROANOKE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Case No. 7:23-CR-00047 |
| ) | |
| DAMON TYLER MILLS ) | |

## GOVERNMENT'S MOTION TO DISQUALIFY COUNSEL AND OPPOSITION TO MOTION TO SUBSTITUTE

The defendant, Damon Tyler Mills, has moved to substitute Attorney Anthony Anderson as counsel to represent him in this case.[1] As outlined below, the Government has concerns about the existence of a potential conflict of interest that has a high likelihood of materializing and seeks the Court's review to ensure conflict-free representation. In short, the Government opposes the motion to substitute due to a conflict of interest and respectfully requests that Mr. Anderson be disqualified as counsel for Mr. Mills.

## FACTUAL BACKGROUND

[REDACTED]

---

[1] The Federal Public Defender's office was originally appointed to represent Mr. Mills. It now appears that Mr. Mills has sought to retain Mr. Anderson.

[redacted] has been represented by Mr. Anderson in this matter.[2]

## II. The Instant Case

On October 31, 2023, a grand jury sitting in this District returned a 5-count Indictment against Damon Tyler Mills, charging him with Conspiracy to Commit Hobbs Act Robbery (Count One), Hobbs Act Robbery (Count Two), two firearms offenses (Counts Three and Four), and a controlled substance offense (Count Five). Indictment (ECF No. 3). The charged offenses relate to two events, one occurring in December 2018 (Counts One through Three) and another occurring in February 2019 (Counts Four and Five).

With respect to the December 2018 event, the Government expects the evidence at trial to establish the following. In around September of 2017, Mr. Mills first met [redacted]. At the time, they were both selling marijuana. While they initially had different sources of supply, within a couple of months, Mr. Mills started using [redacted] as his source of supply. The two became friends, and in February 2018, they started living together. [redacted] continued to sell marijuana to Mr. Mills on a regular basis, and Mr. Mills also helped [redacted] with his own sales. But by

[2] [redacted] was indicted on [redacted], and was briefly represented by an Assistant Federal Public Defender, who noticed her appearance on [redacted]. On [redacted], Mr. Anderson moved to substitute himself as counsel and filed his notice of appearance. The Court granted this motion on [redacted]. [redacted] has been represented by Mr. Anderson since that date.

May 2018, their relationship had deteriorated. ▓▓▓▓ moved out (and began living at the ▓▓▓▓ address), and he stopped selling marijuana to Mr. Mills.

In December 2018, ▓▓▓▓ was living with his father on Compton Avenue in Roanoke when, late one night, two masked individuals with guns broke into the house, made their way into ▓▓▓▓ bedroom, and robbed him and his then-girlfriend. They tied up ▓▓▓▓ with zip ties, cut his throat with a knife, and threatened to kill him. They threw ▓▓▓▓ girlfriend onto the bed. Although the two men were masked, ▓▓▓▓ was able to recognize one of the robbers to be Mr. Mills by various identifying features, including his voice and his distinctive firearm.

The robbers searched the bedroom for firearms and found an AK-47 that ▓▓▓▓ had recently borrowed from ▓▓▓▓. The robbers stole the AK-47, as well as some marijuana and some money. That AK-47 was the one that corresponded to the empty box (serial number AKB007510) found in the search of ▓▓▓▓.

In February 2019, Mr. Mills was involved in a shooting (which is a part of the conduct underlying Count Four), after which his phone was seized. As a part of a search of that cell phone, law enforcement recovered photographs that the metadata revealed had been taken on January 11, 2019. Those photos include selfies of Mr. Mills holding an AK-47, as well as a close-up photograph of the serial number of that AK-47. That close-up photograph revealed the serial number to be AKB007510, thereby identifying the AK-47 that Mr. Mills was holding on January 11, 2019, as the same firearm that ▓▓▓▓ had lent to ▓▓▓▓ and that ▓▓▓▓ had had stolen from him in December 2018.

In the course of the Government's investigation into Mr. Mills, the Government interviewed several witnesses about their knowledge of the December 2018 robbery. Among those interviews was a September 12, 2023, proffer session with ▓▓▓▓, during which the

3

Government questioned him about his knowledge regarding Tyler Mills and the December 2018 robbery. Mr. Anderson represented ▆▆▆▆ in the course of this interview (along with Mr. Anderson's colleague, Brooks Duncan).

### III. Anticipated Testimony at Trial

The Government's primary evidence with respect to Counts One through Three are ▆▆▆▆ testimony and the photographs found on Mr. Mills's phone. It is thus crucial to the Government's case to be able to 1) rehabilitate ▆▆▆▆ after he is inevitably impeached and 2) trace the movement of the AK-47 from ▆▆▆▆ to ▆▆▆▆ to Mr. Mills.

At trial, the Government expects that ▆▆▆▆ will testify to the above-described events. The Government also expects that ▆▆▆▆ will be impeached based on his felony convictions, the significant term of incarceration that he is currently serving, and his falling-out with Mr. Mills. As a part of these efforts to impeach ▆▆▆▆, he will likely be subject to forceful cross-examination on the idea that he is trying to curry favor with the Government in the hopes of earning a motion to reduce his sentence under Federal Rule of Criminal Procedure 35. Once ▆▆▆▆ has been impeached, the Government intends to rehabilitate ▆▆▆▆ in multiple ways, including by corroborating his testimony.

▆▆▆▆ will corroborate ▆▆▆▆ testimony in at least three ways. ▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ This testimony will not only corroborate ▆▆▆▆, but will also help to establish that the AK-47 that Mr. Mills posed with in January 2019 is the same AK-47 that ▆▆▆▆ lent to ▆▆▆▆. Second, ▆▆▆▆ will testify that he saw ▆▆▆▆ wounds in the aftermath of the robbery, which will help the Government prove that this robbery did in fact occur and will further corroborate ▆▆▆▆ testimony. Third, the Government expects that ▆▆▆▆ will testify about ▆▆▆▆ prior consistent statements

about the December 2018 robbery. *See* Fed. R. Evid. 801(d)(1)(B)(i), (ii). In addition to being offered to rehabilitate ▇▇▇▇, these statements will be admissible as substantive evidence in their own right.

In turn, the Government also expects ▇▇▇▇ credibility to be challenged. After all, he, too, is a felon serving a lengthy term of imprisonment. For that reason, the Government also anticipates calling ▇▇▇▇ as a witness at trial. After ▇▇▇▇ told ▇▇▇▇ about the December 2018 robbery, ▇▇▇▇ shared much of this information with ▇▇▇▇. The Government thus anticipates calling ▇▇▇▇ as a witness in order to rehabilitate ▇▇▇▇, and thereby ▇▇▇▇. *See* Fed. R. Evid. 801(d)(1)(B)(i), (ii). ▇▇▇▇ statements to ▇▇▇▇ will be admissible as substantive evidence and will help to corroborate two of the Government's most crucial witnesses, ▇▇▇▇ and ▇▇▇▇.

## LEGAL BACKGROUND

Virginia Rule of Professional Conduct[3] 1.7 provides, as relevant here, that a lawyer generally "shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if: (1) the representation of one client will be directly adverse to another client; or (2) there is significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client . . . or by a personal interest of the lawyer." Va. R. Prof'l Conduct 1.7(a). Any Rule 1.7 conflict is imputed to the lawyer's firm. *Id.* 1.10(a). Such a conflict (or imputed conflict) can be overcome "if each affected client consents after consultation, and: (1) the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client; (2) the

---

[3] The Virginia Rules of Professional Conduct apply to attorneys practicing in the Western District of Virginia. W.D. Va. Fed. Rules of Disciplinary Enforcement, Rule IV(B).

representation is not prohibited by law; (3) the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal; and (4) the consent from the client is memorialized in writing." Va. R. Prof'l Conduct 1.7(b), 1.10(c).

It is also the case that "[a] lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless both the present and former client consent after consultation." Va. R. Prof'l Conduct 1.9(a). Moreover, "[a] lawyer who has formerly represented a client in a matter . . . shall not thereafter (1) use information relating to or gained in the course of the representation to the disadvantage of the former client," except as the Rule permit or require, or if the information is "generally known," or "(2) reveal information relating to the representation," except as the Rules permit or require. *Id.* 1.9(c). Any Rule 1.9 conflict is imputed to the lawyer's firm. *Id.* 1.10(a).

"Joint representation of conflicting interest is suspect because of what it tends to prevent the attorney from doing." *Holloway v. Arkansas*, 435 U.S. 475, 489–90 (1978). For example, "the attorney may be armed with information useful for effective cross-examination but unable to use it because it was acquired through confidential communications with the witness." *Dowell v. Commonwealth*, 351 S.E.2d 915, 918 (Va. Ct. App. 1987). "The confidentiality rules protect both the former client from the obvious threats of divulging confidential information or using it to the former client's disadvantage, and the new client from the lawyer's inability or hesitancy to develop favorable information because of the lawyer's duty to protect the former client's confidential information." *Rd. King Dev., Inc. v. JTH Tax LLC*, 540 F. Supp. 3d 554, 559 (E.D. Va. 2021). For

6

this reason, "when confidentiality conflicts with the right to choose counsel, confidentiality prevails." *Id.*

Although there is "a presumption in favor of [a defendant's] counsel of choice . . . that presumption may be overcome not only by a demonstration of actual conflict but by a showing of a serious potential for conflict." *Wheat v. United States*, 486 U.S. 153, 164 (1988). "In determining whether to disqualify counsel for conflict of interest, the trial court is not to weigh the circumstances 'with hair-splitting nicety' but, in the proper exercise of its supervisory power over the members of the bar and with a view of preventing 'the appearance of impropriety,' it is to resolve all doubts in favor of disqualification." *United States v. Clarkson*, 567 F.2d 270, 273 n.3 (4th Cir. 1977) (quoting *Gas-A-Tron of Ariz. v. Union Oil Co. of Calif.*, 534 F.2d 1322, 1324–25 (9th Cir. 1976)).

It is true that "disqualification of a litigant's chosen counsel for violation of an ethical canon . . . may not be rested on mere speculation that a chain of events whose occurrence theoretically could lead counsel to act counter to his client's interests might in fact occur." *Shaffer v. Farm Fresh, Inc.*, 966 F.2d 142, 145 (4th Cir. 1992). And "[m]ore than a *mere possibility* of a conflict" must be shown. *United States v. Tatum*, 943 F.2d 370, 375 (4th Cir. 1991). "The Sixth Amendment is implicated only when the representation of counsel is adversely affected by an *actual* conflict of interest," meaning that the attorney is "actively represent[ing] conflicting interests." *Id.*

But, as the Supreme Court has recognized, it is the "rare case[ ] where an actual conflict may be demonstrated before trial." *Wheat*, 486 U.S. at 163. And disqualification of counsel may be appropriate even in "cases where a potential for conflict exists which may or may not burgeon into an actual conflict as the trial progresses." *Id.* This is because of the difficulty in being able to

7

predict when (or if) a potential conflict might develop into an actual conflict. As the Supreme Court described:

> [A] district court must pass on the issue whether or not to allow a waiver of a conflict of interest by a criminal defendant not with the wisdom of hindsight after the trial has taken place, but in the murkier pre-trial context when relationships between parties are seen through a glass, darkly. The likelihood and dimensions of nascent conflicts of interest are notoriously hard to predict, even for those thoroughly familiar with criminal trials. It is a rare attorney who will be fortunate enough to learn the entire truth from his own client, much less be fully apprised before trial of what each of the Government's witnesses will say on the stand. A few bits of unforeseen testimony or a single previously unknown or unnoticed document may significantly shift the relationship between multiple defendants. These imponderables are difficult enough for a lawyer to assess, and even more difficult to convey by way of explanation to a criminal defendant untutored in the niceties of legal ethics.

*Id.* at 162–63.

"The key to assessing 'the question of attorney disqualification in the successive representation context' is assessing the substantiality of the relationship between the present and the prior representation." *Sunbeam Prod., Inc. v. Hamilton Beach Brand, Inc.*, 727 F. Supp. 2d 469, 472 (E.D. Va. 2010) (quoting *Tessier v. Plastic Surgery Specialists, Inc.*, 731 F. Supp. 724, 730 (E.D. Va. 1990)). "[O]nce an attorney-client relationship has been established, an irrebuttable presumption arises that confidential information was conveyed to the attorney in the prior matter." *Tessier*, 731 F. Supp. at 731.

The substantial relationship "test encompasses more than situations in which the issues are indistinguishable." *Sunbeam*, 727 F. Supp. 2d at 473. " '[I]f the lawyer could have obtained confidential information in the first representation that would have been relevant in the second,' then the matters are considered to the substantially related." *Id.* (quoting *Tessier*, 731 F. Supp. at 730). "The purpose of the 'substantial relationship' test is to prevent an attorney from appearing against [a] former client whenever there is reasonable probability that confidences were disclosed

8

in prior representation which could be used against [a] former client in subsequent litigation." *Rd. King Dev.*, 540 F. Supp. 3d at 562.

Relevant factors to be analyzed in evaluating the existence of a "substantial relationship" include "the issues involved; the relation of the issues and the facts involved in the attorney's respective representation of the client; the time frames covered in each case; the causes of action; the legal theories; and the parties involved." *Id.* at 562. It is not the case that each factor must "be identical for an attorney's representation to be deemed substantially related to disqualify him as counsel." *Id.*

Although "they may rely on defense counsel in the first instance, trial courts have a duty to closely monitor cases involving multiple representation 'since a possible conflict inheres in almost every instance of multiple representation.'" *Dowell*, 351 S.E.2d at 917 (quoting *Cuyler v. Sullivan*, 446 U.S. 335, 348 (1980)). Where "an objection is made to multiple representation or if the possibility of a conflict of interest is apparent, a trial court has a duty to conduct further inquiry to determine if an actual conflict exists." *Id.*[4]

## ANALYSIS

The potential conflict[5] in this case revolves around Mr. Anderson's representation of ▮▮▮. Mr. Anderson has not only represented ▮▮▮ in ▮▮▮ own criminal case, but Mr. Anderson has also represented ▮▮▮ in *this* criminal case. As mentioned above, Mr. Anderson represented ▮▮▮ during a September

---

[4] However, neither client nor counsel should be required to divulge the content of any privileged information unless the client expressly waives the privilege. *United States v. Young*, 644 F.2d 1008, 1014 (4th Cir. 1981).

[5] The Government acknowledges that no actual conflict currently exists. But there is no doubt that there exists a potential conflict that may well ripen into an actual one. If that does come to pass, it will happen during trial. Our collective inability to predict the future prevents us from being able "to say with any certainty" if such a conflict might arise. *See id.* at 1013. But that does not mean that nothing prophylactically can or should be done about it. *See Wheat*, 486 U.S. at 162–63; *see United States v. Basham*, 561 F.3d 302 (4th Cir. 2009) (upholding disqualification of counsel with regard to statements made by counsel that the district court later determined were inadmissible).

12, 2023, proffer session during which the Government questioned ▉▉▉▉ about his knowledge regarding Tyler Mills and the December 2018 robbery.

Although ▉▉▉▉ has now been sentenced, it remains unclear whether Mr. Anderson will continue to represent ▉▉▉▉ in his criminal case should there be additional developments in that case. For example, should ▉▉▉▉ provide additional cooperation in Mr. Mills's case—such as testifying at trial—▉▉▉▉ may seek to benefit from a substantial assistance motion, pursuant to Federal Rule of Criminal Procedure 35, in order to reduce his probationary sentence. It is also unclear whether Mr. Anderson intends to continue to represent ▉▉▉▉ in the Tyler Mills matter. Despite these uncertainties, should Mr. Mills's case go to trial, Mr. Anderson may find himself in a position where he is representing one client (Mills) while cross-examining another client (▉▉▉▉) and then filing a Rule 35 motion on behalf of the client he cross-examined (▉▉▉▉) in which he argues how the cooperation of that client (▉▉▉▉) against his other client (Mills) warrants a reduced sentence for the client (▉▉▉▉) whose credibility he sought to destroy.

Although there are different ethical rules in play for current clients and former clients, the analysis is a similar one. *See Young*, 644 F.2d at 1012 ("[T]he possibility of a conflict of interest is not dispelled by the termination of the former lawyer's services. The lawyer may have received confidential information from his former client that is detrimental to that client but favorable to the lawyer's present client. In this event, a conflict of interest arises that is not substantially different from that which may occur in instances of multiple representation."). As a result, the Government will analyze the potential conflicts of interest for Mr. Anderson both through the lens of ▉▉▉▉ as a former client and as a current client.

I.   Rule 1.7

As discussed above, Rule 1.7 generally prohibits representation of multiple clients, absent their informed written consent, 1) where the clients' interests are directly adverse to one another or 2) where there is a significant risk that representation of at least one of the clients will be materially limited by the lawyer's responsibilities to another client.

Should this case go to trial, the Government expects the following to occur. ▇▇▇▇ will testify against Tyler Mills, ▇▇▇▇ will be impeached, he will be rehabilitated in part through ▇▇▇▇ testimony, ▇▇▇▇ will be impeached, and ▇▇▇▇ will be rehabilitated through ▇▇▇▇ testimony. Because ▇▇▇▇ is expected to provide testimony at trial that is harmful to Tyler Mills, and because Mr. Mills's attorney will undoubtedly seek to cross-examine ▇▇▇▇ and to attack his credibility, Tyler Mills's and ▇▇▇▇ interests will be directly adverse to one another. *See* ABA Model R. Prof'l Conduct 1.7 cmt. 6 ("[A] directly adverse conflict may arise when a lawyer is required to cross-examine a client who appears as a witness in a lawsuit involving another client, as when the testimony will be damaging to the client who is represented in the lawsuit.").[6]

There is also a significant risk that representation of Mr. Mills would be materially limited by Mr. Anderson's responsibilities to ▇▇▇▇ (or vice versa). This risk remains whether ▇▇▇▇ remains a current client or whether he is a former client. Specifically, Mr. Anderson has likely learned a significant amount of information about ▇▇▇▇ in the course of the last several years of this representational relationship, both about ▇▇▇▇ in general and about his criminal case in particular. Much of this information may be useful fodder for cross-examination.

---

[6] Although the Virginia Supreme Court has not adopted the entirety of Comment 6 to Rule 1.7 (including the example quoted here), the example merely illustrates the natural consequence of Rule 1.7, a rule that the Virginia Supreme Court *has* adopted.

But, to the extent that this information is not publicly known, that would mean that Mr. Anderson would be torn between dueling loyalties to his two clients (or to one client and one former client).[7] He would have to either sacrifice his duty of loyalty to Mr. Mills by forgoing potential avenues for cross-examination of ▮▮▮▮▮▮, or sacrifice his duty of confidentiality to ▮▮▮▮▮▮ by disclosing confidential information in the course of a robust cross-examination.

In order to be able to overcome these hurdles, it must be the case that the lawyer reasonably believes that he is able to provide competent and diligent representation, and each affected client must provide written consent, among other things. To be sure, "trial courts necessarily rely in large measure upon the good faith and good judgment of defense counsel." *Cuyler*, 446 U.S. at 347.[8] But "[f]ederal courts have an independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them." *Wheat*, 486 U.S. at 160. For the same reason, a defendant's waiver does not "necessarily solve the problem" of a conflict of interest. *Id.* at 161–62. "[W]here a court justifiably finds an actual conflict of interest, there can be no doubt that it may decline a proffer of waiver . . . ." *Id.* at 162. And district courts have "substantial latitude in refusing waivers of conflicts of interest not only in those rare cases where an actual conflict may be demonstrated before trial, but in the more common cases where a potential for conflict exists which may or may not burgeon into an actual conflict as the trial progresses." *Id.* at 163.

---

[7] While there certainly may be a role for the conscious mind to play here, it is also exceedingly difficult for a lawyer (or anyone) to be able to create a firm divide between information that is publicly known and information that is subject to a client's confidences. Innocent mistakes happen, and a well-intentioned lawyer may seek to steer well clear of the line in order to avoid potentially breaching the confidences of the client subject to cross-examination. That, in turn, would hinder the lawyer's representation of the client on trial.

[8] To be clear, the Government does not impute any ill motive to Mr. Anderson. The Government is confident that Mr. Anderson does believe that he is able to provide competent and diligent representation to both Mr. Mills and ▮▮▮▮▮▮. Whether the Court agrees that this belief is a reasonable one is a different question. *See Clarkson*, 567 F.2d at 273 n.3 (noting that the "motives of counsel in seeking to appear" are irrelevant).

## II.     Rule 1.9

Rule 1.9 only applies in the event that ▮▮▮▮▮ becomes a former client. Should that happen, it applies in cases involving the "same or substantially related matter" and where the clients' interests are materially adverse. As explained above, ▮▮▮▮▮ and Mr. Mills's interests would be materially adverse—actually, directly adverse—in the event ▮▮▮▮▮ testifies against Mr. Mills at trial. In addition, Mr. Anderson has represented ▮▮▮▮▮ in this same matter—he represented ▮▮▮▮▮ in a September 2023 proffer session.

Mr. Mills's case is also a substantially related matter to ▮▮▮▮▮ case. Both cases are drug and firearm cases involving some of the same individuals (namely, ▮▮▮▮▮ and ▮▮▮▮▮) and the relevant events happened within a few months of one another. Even setting aside Mr. Anderson's representation of ▮▮▮▮▮ in this very matter, there is a strong likelihood that Mr. Anderson "could have obtained confidential information in" his initial representation of ▮▮▮▮▮ that would be relevant in his representation of Mr. Mills. *See Sunbeam*, 727 F. Supp. 2d at 473; *Rd. King Dev.*, 540 F. Supp. 3d at 562.

In such a situation, where Rule 1.9 applies, a lawyer is prohibited from using information relating to or gained in the course of the lawyer's representation of the former client to the disadvantage of the former client unless permitted or required by the Rules or the information has become generally known. Va. R. Prof'l Conduct 1.9(c)(1). A lawyer also cannot reveal information relating to the representation except as permitted or required by the Rules. Va. R. Prof'l Conduct 1.9(c)(2). This presents the same potential conflict as outlined above, where Mr. Anderson may be caught between his duty of confidentiality to ▮▮▮▮▮ and his duty of loyalty to Mr. Mills.

There is one more potential ethical problem that is a potential consequence of navigating the above-outlined challenges. As is by now apparent, the potential conflict that is at issue can

13

only ripen into an actual conflict were this case to go to trial. A lawyer could thus avoid the conflict entirely by encouraging his client to plead guilty, even if that is not in his client's best interest. As a result, a lawyer who seeks to avoid the difficulties presented by a potential conflict of interest that can only materialize at trial may be incentivized to try, even subconsciously, to eliminate that conflict of interest by resolving the case via a guilty plea.

The bottom line is that if Mr. Anderson is permitted to represent Mr. Mills these potential conflicts will loom over this case until its resolution. While the Government recognizes that the realization of these potential conflicts will not come to pass for some time, that is not a reason to wait. There is a virtue in removing conflicted counsel in the early stages of a proceeding. *See Basham*, 561 F.3d at 325. And there is no reason to wait and see what might materialize at trial when significant resources have already been expended on this case (including by potentially conflicted counsel).

The Fourth Circuit's decision in *Basham* is illustrative in that regard. In that case, appointed defense counsel, after consulting with his client, provided the Government with some "hypothetical" information that incriminated the client's co-defendant. 561 F.3d at 321–22. The Government later moved to disqualify counsel, arguing that defense counsel had made himself a witness. *Id.* at 322. That is, the Government noted that it intended to admit at trial defense counsel's statements about the hypothetical information under Federal Rule of Evidence 801(d)(2)(D), in part to demonstrate that the statements were provably false and that this was evidence that defense counsel's client was trying to shift blame to his co-defendant. *Id.* The district court disqualified defense counsel. *Id.* On appeal, the Fourth Circuit found that this disqualification was not an abuse of discretion, even though the district court later found the defense counsel's statements to be inadmissible (thereby eliminating the primary rationale behind the finding of the conflict). *Id.* at

14

324. In particular, the Fourth Circuit noted that there remained the possibility throughout trial that defense counsel might be a witness and that defense counsel might have had an incentive to "attempt to marshal the evidence and try the case in such a way as to ensure that [the] statements could not be an issue in the case." *Id.* The lesson from this case is that it is less important how things actually unfold than the potential concern about what might unfold and how a potentially conflicted lawyer might shape his behavior in order to avoid an actual conflict from being realized.

### III.     Potential Remedies

As explained above, the Rules of Professional Conduct outline some remedies for resolving this potential conflict. And should the Court disagree that disqualification is appropriate, the Government would request that one of these other remedial measures be taken. At the very least, both Mr. Mills and ▮▮▮▮▮▮ should be advised of the potential conflicts outlined above in open court in an on-the-record colloquy, and they should be presented with written waivers acknowledging their awareness of these potential conflicts and their desire to allow Mr. Anderson to proceed with his representation of Mr. Mills. Such signed waivers should be required in order to allow Mr. Anderson to be able to represent Mr. Mills.

The Fourth Circuit has previously recommended that defense counsel "be questioned to determine whether, in his role as [one defendant's] former attorney, he received from [that defendant] information detrimental to [that defendant's] defense that he could have used on cross-examination to buttress [the other defendant's] defense." *Young*, 644 F.2d at 1013–14. But this remedy was recommended after a full trial and after the issues surrounding the conflict at issue had sharpened to a much greater degree than is possible at this posture. It is thus questionable whether such an inquiry in this case can be fully effective.

**CONCLUSION**

For the reasons explained above, the Government respectfully requests that the motion to substitute be denied and that Mr. Anderson be disqualified as counsel as a result of the potential conflicts of interest outlined above. Should the Court disagree, the Government would respectfully request that an inquiry be made into Mr. Anderson's ability to provide conflict-free representation to Mr. Mills and that this representation only be permitted to go forward if Mr. Mills and ▮ ▮ both sign conflict waivers after engaging in an on-the-record colloquy with the Court regarding the potential conflicts outlined above.

Respectfully submitted,

CHRISTOPHER R. KAVANAUGH
United States Attorney

/s/ Jason M. Scheff
Jason M. Scheff
Assistant United States Attorney
New York Bar No. 5188701
United States Attorney's Office
310 First Street, SW, 9th Floor
Roanoke, Virginia 24011
540-857-2250
Jason.Scheff@usdoj.gov

CERTIFICATE OF SERVICE

I hereby certify that on December 14, 2023, I caused to be filed this Motion to Disqualify Counsel and Opposition to Motion to Substitute with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

/s/ Jason M. Scheff
Assistant United States Attorney